Filed 4/4/13  P. v. Hays CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B227157 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA302646) |
| v. | |
| DAVION HAYS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. William C. Ryan, Judge.  Reversed.

William J. Kopeny for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc A. Kohm and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Davion Hays appeals from a judgment entered after a jury convicted him of one count of willful, deliberate and premeditated murder and two counts of willful, deliberate and premeditated attempted murder and found firearm enhancement allegations to be true. The trial court sentenced Hays to two consecutive life terms plus 100 years to life. Hays contends there was insufficient evidence to prove he did not act in self-defense. We disagree, finding sufficient evidence in the record supporting Hays's convictions for premeditated murder and premeditated attempted murder.

Hays also contends the trial court committed reversible error in admitting evidence of uncharged possession of a sawed-off shotgun not related to the charged offenses. We agree and reverse.

## BACKGROUND

At trial, Hays did not dispute he fired seven rounds from a handgun he owned (a 10-millimeter Glock) at Rolling 60's Crips gang members and associates, while he was a passenger in a vehicle driving on Crenshaw Boulevard at about 3:50 a.m. on May 15, 2005. Hays claimed he fired his gun in self-defense as two or three men on foot chased the vehicle Hays was riding in and fired upon it. The prosecution argued Hays committed premeditated murder and attempted murder, which was motivated by Hays's association with the Inglewood Family Bloods gang, a neighboring gang and "violent" enemy of the Rolling 60's Crips.

Because there was no criminal street gang enhancement allegation alleged in the information,[1] the trial court ruled the prosecution must put on its evidence of the murder and attempted murders before it could call its gang expert to testify regarding the purported motive for the crimes.

**Prosecution Evidence**

Sometime after 3:00 a.m. on May 15, 2005, Jamal Wallace, an admitted Rolling 60's Crips gang member, and Timothy Green, a Rolling 60's associate, were socializing

---

[1] At the preliminary hearing, the prosecution did not present evidence to support the gang enhancement allegation and conceded the allegation should be dismissed.

outside Chris Burgers, a fast-food restaurant on Crenshaw Boulevard in Los Angeles. There were about 20 to 30 people standing in the parking lots adjacent to Chris Burgers. Chris Burgers is located inside territory claimed by the Rolling 40's Crips gang, an ally of the Rolling 60's, and is a place where Crips gang members are known to congregate.

As Wallace was walking among the people in the parking lot, a gray and white Chevy Tahoe sport utility vehicle "caught [his] attention." The Tahoe was driving on Crenshaw Boulevard and it circled the area around Chris Burgers three times. The sight of this vehicle circling the area caused Wallace concern and he was ready to get in his car and drive away if something bad started to happen.

Suddenly, Wallace heard gunshots coming from Crenshaw Boulevard in rapid succession. It sounded like they were being fired from the same gun. Wallace was shot in the back of the leg before he could run to his car. He was struck after the first or second gunshot he heard. Wallace continued to hear rapid gunfire after he fell to the ground. He was able to get into his car and drive himself to the hospital. The bullet was not removed from his leg.

Timothy Green, who had been standing near Wallace, was shot in the neck resulting in paralysis. At the time of trial, he was in a wheelchair, able to move only his head and the upper portion of his arms.

Los Angeles Police Officer Robert Canizales arrived on the scene. He saw 30 to 40 people standing outside Chris Burgers, some of whom he believed to be East Coast Crips and Rolling 60's Crips gang members. He requested an ambulance for Green, who was lying on the ground, bleeding from his neck wound. As Canizales waited for the ambulance and additional officer assistance, he heard a car skid to a stop in the middle of the intersection. Several men exited the vehicle. One of the passengers was holding his neck, which was bleeding. The injured man, Tramon Harrison, ran toward Canizales. The other men from the vehicle surrounded Harrison, and started screaming, "'This is 60's, Cuz. This is 60's.'" Harrison collapsed onto the ground. Other civilian vehicles pulled up and stopped in the area. The men in the now even larger crowd began fighting amongst themselves. Harrison died at the scene.

3

At the crime scene, officers recovered seven 10-millimeter casings on Crenshaw Boulevard; two .22 caliber casings on the western side of the parking lot; one .22 caliber casing on the eastern side of the parking lot; one .25 caliber casing on the eastern side of the parking lot; two 9-millimeter casings on the western side of the parking lot, near Timothy Green's parked vehicle; and one 9-millimeter live round.

Los Angeles Police Detective Wallace Tennelle, the investigating officer on this case, did not have a suspect until October 2005. Prior to that time, he received information that this was a drive-by shooting, possibly gang-related, and that the shooter might have been traveling in a red Chevy Tahoe. Witnesses reported seeing a red Tahoe circling the area around Chris Burgers.

On October 26, 2005, Detective Tennelle interviewed a man named Dexter Glasgow who was incarcerated for bank robbery. After Dexter[2] was arrested, he told the police he had information on three murders, including this case, that he would share in exchange for leniency when he was sentenced. Tennelle decided to interview Dexter after hearing from another officer that Dexter knew a 10-millimeter semiautomatic handgun had been used in the shooting at Chris Burgers. This was information law enforcement had not made public.

Dexter had known defendant Hays for most of Hays's life because their families had been neighbors in Inglewood, in an area claimed by the Inglewood Family Bloods gang. Dexter's brother, Dwayne, was close friends with Hays.

On or about May 16, 2005, Hays attended a party at Dexter's sister's house to celebrate her birthday and Dwayne's birthday. Hays approached Dexter and said he had had "a little problem" at Chris Burgers when he went there with his friend, Mark. Hays said Mark drove them to Chris Burgers in his Chevy Tahoe.[3] While sitting in Mark's vehicle, Hays got into an argument with some men who were in the parking lot at Chris

---

[2] We refer to him by his first name because both Dexter and his brother, Dwayne Glasgow, testified at trial.

[3] Dexter told Detective Tennelle the Chevy Tahoe was red.

Burgers and one of them pulled out a gun. Hays shot two men with his 10-millimeter Glock. He saw one of the men fall and believed the man was dead. Mark and Hays left the area quickly. Hays did not say anyone fired shots at him and Mark.

Hays asked Dexter what he could do to make the gun "unrecognizable if it ever got into the hands of the police." Hays explained, after the shooting, he "altered the firing pin, he scraped up the firing pin." Dexter told Hays to get rid of the gun, but Hays said he did not want to do that. Dexter suggested Hays search the Internet for information on ways to make a gun unrecognizable or to alter it. Hays said Mark had gotten his Chevy Tahoe repainted since the shooting.

After this conversation with Hays at the birthday party, Dexter saw Mark's black Chevy Tahoe parked in front of Hays's house. Hays introduced Mark to Dexter. Hays told Dexter Mark was a member of a Bloods gang.

On November 1, 2005, Los Angeles Police Officer Christopher Giargiari was on patrol when he saw four men standing outside who appeared to be drinking alcohol in public. One of the men was Hays. As Giargiari and his partner exited their patrol car, the four men began to walk away quickly. Giargiari's partner ordered the four men to stop. Only Hays complied with the order. As the officers approached, Hays told them he had a gun in his waistband. The officers detained Hays and handcuffed him. The gun was a 10-millimeter semiautomatic Glock. It was loaded with one round in the chamber and eight rounds in the magazine. At the police station, Hays informed the officers he purchased the gun for protection because someone had shot at him and his girlfriend. He was not referring to the shooting in this case. He also stated he was a security guard and was getting certified to become an armed security guard. Giargiari's partner searched and found a police report stating in June 2003, Hays reported someone had fired upon him with a rifle, striking his vehicle six times.

The gun recovered from Hays on November 1, 2005 was registered to Hays. A Los Angeles Police Department firearms examiner determined the seven 10-millimeter casings found at the crime scene at Chris Burgers were fired from Hays's gun. The serial number on Hays's gun was not scraped off. The firearms examiner also determined a

5

bullet recovered from Timothy Green was either a 10-millimeter or .40 caliber bullet. It had been contaminated with body fluids and the markings had eroded away. No bullet or bullet fragment was recovered from Tramon Harrison's body.

Hays was placed under surveillance after his November 1, 2005 arrest. On November 8, 2005, Hays visited a residence in the Inglewood neighborhood where he lived and spoke to a man who was known to law enforcement to be an Inglewood Family Bloods gang member. When Hays left the residence, an officer saw Hays and the man exchange a Bloods gang hand sign—"the 'B' sign." Later the same day, Hays returned to that residence wearing a red bomber jacket. An officer saw four other men at that location who also were wearing red jackets.

At some point, Detective Tennelle determined that the man who drove Hays to Chris Burgers on May 15, 2005 was a man named Michael Roundtree (not "Mark" as Dexter had referred to him). Tennelle interviewed Roundtree on November 23, 2005. At the time of the shooting, Roundtree owned a gray and white Chevy Blazer (not a Tahoe). After the shooting, Roundtree had his vehicle repainted black. Roundtree told Tennelle he was a gang member. Tennelle determined that Roundtree was an Inglewood Family Bloods gang member.

On December 15, 2005, a Los Angeles Police Department criminalist examined Roundtree's Chevy Blazer. She and her team discovered one bullet hole on the passenger side of the vehicle, "above the rear wheel well." The bullet hole had been repaired. It was visible from the inside, but not from the outside of the vehicle. The criminalist could not determine the caliber or trajectory of the bullet.

Detective Tennelle and other officers searched the home where Hays lived with his family in Inglewood. The officers recovered information from the hard drive of a computer that Hays said was his. There were photos of Hays with his 10-millimeter Glock. There were 50 to 60 photos of Inglewood Family Bloods gang graffiti. There were photos of Hays posing in his bedroom and dressed in a manner that made Tennelle believe he may have been involved in gangs. Tennelle testified: "[H]e's in the pictures posing with guns and wearing red jackets, red ski masks, what generally is known on the

6

street as flaming when they talk about Bloods. They call it -- he's flamed out. He's got red from head to toe."[4] In two of those photos, Hays was holding a sawed-off shotgun, a firearm not related to the charged offenses. Also on the computer's hard drive was an article about changing the ballistic fingerprint of a gun by changing the firing pin and barrel.

Los Angeles Police Officer David Ross testified as the prosecution's gang expert. Before his testimony, the trial court read the jury an instruction regarding the limited purpose of the gang evidence.

Officer Ross is an expert on the Rolling 60's Crips gang. He is familiar with the Inglewood Family Bloods gang and knows it to be a "violent" enemy of Rolling 60's.

Officer Ross testified about some of the photos recovered from Hays's computer. In one photo, Hays was wearing a red jacket with a Cleveland Indians logo on it. Ross believed the photo showed an association with Inglewood Family Bloods because of the color red and the letter "I" in Indians which could stand for Inglewood. Gang members often wear the sports gear of teams that have the same first initial as the gang name. According to Ross, this photo of Hays showed "a typical gang pose"—holding a weapon (a sawed-off shotgun) and "dressed down in the gang's clothing." In another photo from Hays's computer, individuals (not Hays) appeared to be making gang signs with their hands.

Officer Ross stated that not all gang members have gang tattoos.[5] He has "met some very violent members of Rolling 60's who have no tattoos" and do not dress in gang attire.

According to Officer Ross, gang members typically commit crimes with guns that are bought illegally or stolen. Acknowledging that the gun Hays fired at Chris Burgers

---

[4] As stated by the prosecution's gang expert, Bloods "associate with the color red, and Crips traditionally associate with the color blue." Hays was wearing a red jacket on May 15, 2005, when he fired his gun at Chris Burgers.

[5] Hays does not have gang tattoos.

7

was registered in his name, Ross testified he was not familiar with any other case in which a gang member committed a crime with a gun registered in his own name.

Ross formed the opinion Hays was an Inglewood Bloods Family gang member based on his conduct while on surveillance (visiting the residence of a known Inglewood Family Bloods gang member, exchanging a Bloods hand sign with the man, and returning later to the residence dressed in red to meet up with a group of men also dressed in red); the photos on his computer; and the fact he wore a red jacket and circled the area of a known Crips hangout (Chris Burgers), accompanied by an Inglewood Family Bloods gang member (Roundtree).

**Defense Evidence**

Perry Clayton, a resident of the area around Chris Burgers, testified he heard "[g]ang slogans" before he heard gunshots on May 15, 2005. He could not remember anything more specific about the gang slogans.

A criminalist for the coroner testified that decedent Tramon Harrison had gunshot residue on his hands, but that did not necessarily mean he had fired a gun. He could have been "in an environment of gunshot residue" or he could have "received particles from an environmental source."

Dwayne Glasgow and Brandon Anderson, friends of Hays, testified on Hays's behalf. Dwayne had known Hays for about 22 years. Anderson had known Hays for about three and a half years. Neither man knew Hays to be a gang member.

Dwayne and Anderson both said they witnessed the shooting at Chris Burgers on May 15, 2005, each from his own car. May 15 is Dwayne's birthday. Dwayne testified that he was planning to meet up with Hays and Anderson and they were going to cruise Crenshaw Boulevard like they did most Saturday nights. Anderson testified the friends were planning to find a restaurant where they could celebrate Dwayne's birthday. According to Anderson, the men did not discuss cruising Crenshaw Boulevard that night.

The friends were following each other on Crenshaw Boulevard. Anderson was driving alone in his car. Hays was behind Anderson in the Chevy Blazer driven by Michael Roundtree. Dwayne was driving alone in his car, following Roundtree. That

8

night was the first time Dwayne and Anderson had met Roundtree. Roundtree told Dwayne he was not a gang member.

At some point, Anderson became separated from the group as he went through a traffic light. He was the first to drive by Chris Burgers. He saw a lot of people standing on the street to the right of him. He was driving slowly, waiting for Roundtree and Dwayne to catch up to him. About 10 men jumped out in front of his car. The men were making gang signs with their hands and saying, "'Hey, Cuz. Hey, Cuz. This is 60's, Cuz.'" Anderson saw one man holding a gun. Anderson drove away and made a right turn. He called Dwayne and told him not to drive by the intersection of Crenshaw Boulevard and Vernon where Chris Burgers is located.

Roundtree circled the area around Chris Burgers, looking for Anderson. Dwayne followed Roundtree. Dwayne saw 20 to 30 people standing outside Chris Burgers. Dwayne knew Chris Burgers was in Crips territory and that it was a "gang-infested" place. Dwayne knew it was dangerous to stop at Chris Burgers because a gang member might think he was a gang member. Hays was wearing his red Cleveland Indians jacket that night. Dwayne testified he does not wear a lot of red. When the prosecutor asked why, Dwayne responded, "I'm not a Blood."

The second time Roundtree and Dwayne circled the area, Dwayne heard men screaming "'60's'" and saw them making gang signs with their hands. Roundtree and Dwayne could not drive quickly out of the area because there were cars in front of them in both lanes. According to Dwayne, two men ran alongside Roundtree's Blazer and fired bullets at the passenger side of the vehicle where Hays was sitting. Dwayne also heard the sounds of other guns being fired. A bullet struck the rear of the Blazer and the rear passenger side tire went flat. After the first of the two shooters that Dwayne saw fired six or seven rounds with his pistol, Hays stuck his arm out of the window and fired six or seven rounds at the first shooter, who was about seven to eight feet away from Hays. The first shooter continued to fire and came within five or six feet of the Blazer. The second shooter fired four or five shots with a Tech-9. He came within four or five

9

feet of the back of the Blazer. Dwayne testified the shooting ended when the first shooter dropped to the ground and the second shooter stopped firing.

Anderson testified he was parked nearby at the time of the shooting. He saw a red sport utility vehicle with its brake lights on. Next he saw Roundtree's brake lights come on, and then Dwayne's brake lights came on. He saw a flash of light and heard gunfire. Anderson saw three shooters running toward the Blazer. One of the shooters appeared to be close enough to the Blazer to touch it. After the shooting started, Anderson saw Hays stick his arm out the window and fire his gun. One of the shooters fell to the ground. Neither Dwayne nor Anderson reported the shooting to the police.

Hays called an expert witness to testify regarding "shooting reconstruction." Based on evidence gathered from the crime scene, he concluded that shooting victim Timothy Green could not be ruled out as the shooter of the 9-millimeter gun. Based on a blood trail, he concluded that decedent Tramon Harrison moved from the center area of the parking lot to the eastern area of the parking lot. The location of the .22 caliber casings indicates movement by the shooter. The expert concluded the .22 caliber shooter would have been in the line of fire of the 9-millimeter shooter. It cannot be determined from the physical evidence which gun fired the bullet which hit Green, Wallace or Harrison or which gun was fired first.

Hays's uncle and a Los Angeles Police Department detective who had known Hays his whole life both testified as character witnesses. They did not believe Hays was a gang member and did not believe he was a violent person. Prior to the incident, neither witness knew Hays owned a gun. They had never seen Hays dress like a gang member.

Hays also called Detective Tennelle as a witness. He testified he did not find any firearms in Hays's home during the search. The 10-millimeter Glock was the only gun registered to Hays. Neither Hays nor Michael Roundtree had a criminal record and neither was listed in the Calgang database.

**Rebuttal Evidence**

The prosecution called Kerry Tripp, an officer from the Inglewood Police Department gang intelligence unit. He believed Michael Roundtree was an Inglewood

Family Bloods gang member. The same day Tripp testified in this case, he testified at a preliminary hearing in an attempted murder case in which Roundtree was the victim. A fellow Inglewood Family Bloods gang member tried to kill Roundtree. Prior to that attempted murder, Roundtree and two Inglewood Family Bloods gang members (including the defendant in the attempted murder case) had been involved in a drive-by shooting of a rival gang member. Tripp did not know Hays.

Officer Tripp testified about some of the photos recovered from the hard drive of Hays's computer. In one photo, Tripp recognized the Inglewood Family Bloods gang member who was making the "B" sign for Bloods with one hand and the "F" sign for Family with the other hand. In another photo, a woman Tripp did not recognize was making the "F" sign with her hand.

Officer Tripp looked at a photo of Hays wearing his red Cleveland Indians jacket. Tripp testified: "We stopped several Inglewood Family gang members wearing that same kind of jacket. The 'I' is for Inglewood. We've even stopped Inglewood Family gang members who had Cleveland Indians logo tattooed on . . . their body."

Officer Tripp testified that he suspected Hays was a gang member because:

"He's involved in a drive-by shooting, number one. The drive-by shooting is a crime that is almost specific to gang members. [¶] He's in a car with another gang member, Michael Roundtree. They go to a known gang hangout, Chris Burgers, at 43rd and Crenshaw, which is a known Rolling 60's Crip hangout, which is a rival [of] Inglewood Family. They circle the area at least twice, and then they shoot and end up killing at least one individual there.

"The defendant has an affinity for the color red. He has gang graffiti of Inglewood Family gangster Bloods with him. He's been seen at the residence of other Inglewood Family Gangster Bloods. He has photographs of at least one Inglewood Family Blood gang member and a photograph of this female here who appears to be throwing an 'F' up for Inglewood Family, and I say that because this picture was a part of the pictures with the gang graffiti and the pictures of the other gang members.

11

"Now, this gang graffiti is Inglewood Family gang graffiti on a wall, and you have Rolling 60's Crips crossed out, which is a sign of disrespect. When a gang member or a gang crosses out somebody else's name or somebody else's gang, that's a direct challenge and insult to that gang, and I'm saying I have no respect for you. I hate you. I want you dead."

**Verdicts and Sentencing**

The jury found Hays guilty of the willful, deliberate and premeditated murder of Tramon Harrison, and the willful, deliberate and premeditated attempted murders of Timothy Green and Jamal Wallace. On all three counts, the jury found firearm enhancement allegations to be true. (Pen. Code, § 12022.53, subds. (b)-(d).)

On the murder count, the trial court sentenced Hays to 25 years to life plus a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d) [personal and intentional discharge of a firearm proximately causing great bodily injury or death]. On each attempted murder count, the court sentenced Hays to a life term, plus a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). The total sentence is two consecutive life terms plus 100 years to life.

## DISCUSSION

I.      **Sufficiency of Evidence**

Hays contends the evidence presented at trial was insufficient to prove beyond a reasonable doubt he did not act in self-defense. He asserts there is no evidence "the shooting in this case was initiated by the defendant."

Hays argued self-defense to the jury and the trial court properly instructed the jury on self-defense using CALCRIM No. 505. This instruction provides, in pertinent part: "The defendant is not guilty of murder or attempted murder if he was justified in killing or attempting to kill someone in self-defense. The defendant acted in lawful self-defense if : [¶] 1. The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that

12

danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing and the attempted killings were not justified. If the People have not met this burden, you must find the defendant not guilty of murder and attempted murder." The jury rejected self-defense.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] . . . "'""If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]"' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Substantial evidence presented at trial demonstrated: Hays dressed in a red Cleveland Indians jacket, armed himself with a loaded 10-millimeter Glock, met up with an Inglewood Family Bloods gang member, and circled the area around Chris Burgers, a place where Crips gang members were known to congregate. About 20 to 30 people were standing outside Chris Burgers. Yet Roundtree and Hays did not retreat. They came back around and drove past the crowd again.

Jamal Wallace, a Rolling 60's Crips gang member, heard gunshots coming from Crenshaw Boulevard and was struck by the first or second shot he heard. A reasonable

inference from this evidence is that Hays—the person who fired from Crenshaw Boulevard toward the people standing outside Chris Burgers—fired first.

Although Hays argues the killing and attempted killing were justified, he did not report the shooting to the police. He asked Dexter how he could alter his gun, and he downloaded a document to his computer about changing the ballistic fingerprint of a gun.

Hays asked the jury to believe that two men were firing multiple rounds at the Blazer, and each man came within about five feet of the vehicle, but between them they only managed to make one bullet hole in the Blazer.

There is sufficient evidence in the record supporting Hays's convictions for premeditated murder and premeditated attempted murder.

## II.     Admission of Evidence of Uncharged Possession of Sawed-Off Shotgun

The prosecutor introduced and the trial court received in evidence a photograph recovered from the hard drive of Hays's computer, showing Hays from the waist up, posing in his bedroom, wearing a red ski mask and a red Cleveland Indians jacket over a black bulletproof vest, and holding a sawed-off shotgun (People's Exhibit No. 60). Another photograph received in evidence is nearly identical except Hays is not wearing the red Cleveland Indians jacket (People's Exhibit No. 61).[6] Hays contends the trial court abused its discretion in admitting evidence of the uncharged possession of the sawed-off shotgun, a firearm not related to the charged offenses.

It was undisputed at trial that Hays fired a 10-millimeter semiautomatic Glock during the incident from which the charges arise. There is no evidence in the record indicating Hay brought a sawed-off shotgun to the crime scene, or that a sawed-off shotgun was fired during this incident, or that Hays had ever used a sawed-off shotgun on any occasion.

In *People v. Riser* (1956) 47 Cal.2d 566, 577, disapproved on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98, our Supreme Court concluded: "When the

---

[6] We requested and received from the trial court and have reviewed People's Exhibit Nos. 60 and 61.

prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in [the defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." Evidence of a defendant's possession of a firearm not used in the crime "is not admissible when it[s] sole effect is to show a criminal disposition, but if it 'tends logically and by reasonable inference to establish any fact material for the prosecution, or overcome any material fact sought to be proved by the defense, [it] is admissible although it may connect the accused with an offense not included in the charge.' [Citations.]" (*Id*. at p. 578; *People v. Jablonski* (2006) 37 Cal.4th 774, 821-822 [stun gun found in the defendant's vehicle was properly admitted on the issue of premeditation to prove the defendant was prepared to immobilize his victims].) We review the trial court's admission of this evidence for abuse of discretion. (*People v. Jablonski*, *supra*, 37 Cal.4th at p. 821.)

The Attorney General argues: "Here, the purpose of the photograph [People's Exhibit No. 60] was not just to show appellant holding an illegal weapon. It was the manner he posed in the photograph. According to Detective Tennelle, 'Well he's in the pictures posing with guns and wearing red jackets, red ski masks, what generally is Bloods. They call it – he's flamed out. He's got red from head to toe.' [Citation.] Appellant staged the photograph to show he was a gangster. Therefore, when appellant armed himself, dressed in red and drove to a rival gang's neighborhood, his actions indicated his gang-related motive, intent, knowledge, and preparation."

The prosecution introduced and the trial court received in evidence other photographs of Hays wearing red, including one in which he is wearing a red baseball cap and a red shirt and posing with his 10-millimeter semiautomatic Glock (People's Exhibit No. 63), one in which he is wearing a red baseball cap and a red shirt and posing with a pellet gun (People's Exhibit No. 62), one in which he is wearing his red Cleveland Indians jacket (People's Exhibit No. 64A), and one in which he is wearing a red cap and wearing a black bulletproof vest (People's Exhibit No. 36). The prosecution also introduced and the trial court received in evidence three other photographs of Hays

15

posing with his 10-millimeter Glock while not wearing red (People's Exhibit Nos. 35, 55 & 56).[7] In short, the prosecution presented plenty of evidence of Hays wearing red and posing with guns, aside from the two photographs of Hays holding the sawed-off shotgun.

Moreover, the prosecution presented evidence highlighting the illegality and nefarious uses of sawed-off shotguns. The prosecutor asked gang expert, Officer Ross: "Now, you were asked [on cross-examination] specifically about the weapon in this photograph, if it was distinctive in any way for gang members, and you said somewhat or I don't remember what your answer was, but can you explain the significance, if any, to the jury." Officer Ross responded: "Yes. I believe I said that it could be significant, and the significance of that weapon is that it's a shotgun. It's a sawed-off shotgun. Both the barrels have been sawed off fairly short, and also, the stock has been sawed off, and what that does is it reduces the size of the weapon to where it can be easily concealed on a person. [¶] It can be stuck down a person's trousers. It can be hidden under a long jacket or under a long baggy t-shirt. It can be hidden inside of a vehicle to where it's still a shotgun. It still has the same deadly effect up close, but it's a lot more concealable, and this is a weapon that really in my opinion, although I'm not a weapons expert, a weapon like that really has no use other than for some type of criminal activity." The prosecutor next asked Officer Ross if sawed-off shotguns are illegal, and he responded affirmatively.

The trial court abused its discretion in admitting evidence of Hays's possession of a sawed-off shotgun. The fact Hays possessed a sawed-off shotgun did not tend to show he committed the charged offenses. It tended to show Hays "is the sort of person who carries deadly weapons." (*People v. Riser*, *supra*, 47 Cal.2d at p. 577.) There were numerous other photographs received in evidence showing Hays wearing red and holding guns.

---

[7] We requested and received from the trial court and have reviewed People's Exhibit Nos. 35, 36, 55, 56, 62, 63 and 64A.

16

The erroneous admission of this evidence requires reversal because it was prejudicial. Despite the fact there is substantial evidence in the record supporting the convictions for premeditated murder and premeditated attempted murder, the prosecution's evidence supporting the crimes is not overwhelming. The evidence indicated multiple guns were fired at the scene, and no witness testified Hays fired first. There was no bullet recovered from Tramon Harrison's or Jamal Wallace's body. The bullet recovered from Timothy Green was either a 10-millimeter or .40 caliber bullet. Hays presented evidence of self-defense, but the improper admission of evidence of his possession of a sawed-off shotgun improperly undermined his defense. The prosecution's gang expert testified that a sawed-off shotgun "really has no use other than for some type of criminal activity." In closing argument, the prosecutor pointed out Hays was "in possession of an illegal weapon." The erroneously admitted evidence is not comparable to evidence of Hays's possession of a legal firearm lawfully registered in his name. Hays presented evidence that he possessed the 10-millimeter Glock for protection and because he was getting certified to become an armed security guard. The sawed-off shotgun is not connected to the charged offenses and there is no evidence Hays ever used the sawed-off shotgun. Evidence of Hays's possession of a sawed-off shotgun does not tend to show he committed the charged offenses, but it does tend to show he is someone who commits crimes with illegal weapons, based on Officer Ross's testimony that this weapon has no use other than criminal activity. We find it is reasonably probable Hays would have obtained a more favorable result if the evidence of his possession of a sawed-off shotgun had been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Accordingly, we reverse Hays's convictions.

We briefly address below two other issues which are likely to arise if the case is retried.[8]

---

[8] Because we are reversing on other grounds, we do not address Hays's claim of prosecutorial misconduct.

17

**III.    Admission of Evidence of Uncharged Sales of Fake Marijuana**

Hays contends the trial court erred in admitting evidence indicating he was engaged in sales of fake marijuana.

During cross-examination of Detective Tennelle, defense counsel asked him: "During the course of the two year investigation that you conducted, did you come up with evidence of -- any evidence of Davion Hays ever engaging in any gang activity, such as, committing robberies, carjacking, rapes, bank robberies or any of those things that these gang members do?" Tennelle responded, "No."

Outside the presence of the jury, the prosecutor informed the trial court and defense counsel she wanted to follow up on that question during redirect of Detective Tennelle. She explained: "His answer was, no, [sic] I don't believe that to be correct. So I was going to ask him about that, and I wanted to bring to Counsel's attention the fact that there -- and I wasn't going to -- and I didn't bring this up in my direct, but now that I believe the door has been opened, there was a lengthy article called, 'Dealin' Notes' about what you need to do to become a good drug dealer. [¶] And, also, Detective Tennelle did see evidence of drug sales at the house that he ignored and didn't collect but noted so I believe that is evidence. Obviously, drug dealing is a very, very big part of gang activity. I do believe that Counsel has opened the door. I don't need to introduce this document because I do believe it's lengthy, and it's very detailed. [¶] But I would like the opportunity to be able to ask Detective Tennelle about it because the door has been opened on cross-examination, not on direct. I was not intending to bring it up."

Defense counsel objected, arguing "the fact that someone looked up on the Internet and read about certain things and downloaded it from the Internet, that's not evidence of the person engaging in that conduct, the conduct being at issue, being a drug dealer, selling drugs. That's way off in left field."

The trial court overruled defense counsel's objection, stating: "Well, I don't agree it's way off in left field. You know, I do think you opened the door. Basically, you put your client's character in issue by asking the question, and I think you're not entitled to create a false aura of respectability for the jury when that is not the case. It is what it is

18

for what it's worth, and you can certainly show that -- you can certainly argue that having an article on your computer is not the same as committing the crime. But it is there, and I think the People are allowed to go into it."

On redirect, the prosecutor asked Detective Tennelle: "Detective, you also were asked on cross-examination if you found any evidence at all of the defendant engaging in any gang activity, and you were asked specifically about carjacking and bank robberies. Did you find any evidence that the defendant was involved in any sort of gang activities that gang members do?" Tennelle responded affirmatively. On Hays's computer, Tennelle found "a lesson plan on how to deal drugs successfully," called "'Dealin' Notes.'"[9]

The prosecutor also asked Detective Tennelle: "Did you find any other evidence that led you to believe that he was involved in drug dealing?" Tennelle responded affirmatively. He testified: "During the search of his bedroom, I found a box. It looked like maybe a shirt box. I'd say maybe 2 and a half inches deep, 1 inches [sic] by maybe 16 inches, and it was filled with a green, leafy substance which at the time resembled marijuana, and I thought that's what it was. [¶] I then sniffed it, and having worked undercover and purchased a lot of marijuana in my time as an undercover officer, I realized it was oregano, and there was also some plastic baggies, and there was a little maybe 2 by 2 plastic baggies. [¶] Well, that's what they used to fit -- they filled the plastic baggies and sell them as either nickel bags or dime bags of marijuana. [¶] And, normally, when I saw something like that, that's generally from someone who is transient, but they're dealing dope. And what they do is they sell bunk dope, what we call bunk dope, and they'd immediately leave. They never return to the same location so they don't have to worry about retaliation."

On recross-examination, defense counsel asked Detective Tennelle about this evidence of drug dealing. Tennelle testified, based on the evidence he found in Hays's home, that Hays was dealing. Tennelle did not reference the baggies or oregano in his

---

[9] This document was marked for identification, but was not received in evidence.

19

report.  Tennelle never saw Hays selling bunk dope.  While Hays was under surveillance no officer ever reported seeing Hays interacting with drug dealers or buying drugs.  Detective Tennelle did not know whether Hays read the "Dealin' Notes" found on his computer.

The trial court abused its discretion in admitting evidence of sales of fake marijuana.  (*People v. Jablonski*, *supra*, 37 Cal.4th at p. 805.)  The evidence is not relevant.  (Evid. Code, § 210 ["'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].)  It does not tend to show Hays committed murder or attempted murder.  Nor does it tend to show Hays is a gang member.  The prosecution did not present any evidence indicating sales of fake marijuana is a common gang activity.  Instead, the evidence tends to show Hays has a disposition to commit bad acts— acts unrelated to the crimes charged in this case.  Because we are reversing the judgment on other grounds, we need not decide whether the erroneous admission of evidence of sales of fake marijuana was prejudicial.

## IV.   Gang Evidence

Hays does not dispute gang evidence may be admitted in a murder case to prove motive and intent.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  He argues, however, the gang evidence in this case—specifically Officer Tripp's testimony quoted below—was improper because it was based on an assumption Hays was guilty of the charged offenses.

As set forth in the background section of this opinion, the first reason Officer Tripp gave in support of his opinion Hays was a gang member is:  "He's involved in a drive-by shooting, number one.  The drive-by shooting is a crime that is almost specific to gang members.  [¶]  He's in a car with another gang member, Michael Roundtree.  They go to a known gang hangout, Chris Burgers, at 43rd and Crenshaw, which is a known Rolling 60's Crip hangout, which is a rival [of] Inglewood Family.  They circle the area at least twice, and then they shoot and end up killing at least one individual there."

Officer Tripp testified Hays committed a "crime" and "end[ed] up killing" someone. By labeling the shooting a "crime," he gave his opinion Hays did not shoot in self-defense. Officer Tripp's testimony was not an admissible opinion based on a hypothetical. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1041.) Rather, his testimony was an improper opinion on Hays's guilt. (*Id.* at p. 1048 ["'A witness may not express an opinion on a defendant's guilt'"]; *People v. Torres* (1995) 33 Cal.App.4th 37, 46-47 [same].)

We agree with the Attorney General's position that gang evidence was properly admitted in this case to prove motive and intent. Hays fired his weapon at Rolling 60's Crips gang members. The Inglewood Family Bloods gang is a neighboring gang and violent enemy of the Rolling 60's Crips. The prosecution was entitled to present evidence that the shooting was premeditated and motivated by Hays's association with the Inglewood Family Bloods gang. However, it was improper for the prosecution's gang expert to base his opinion that Hays was a gang member on his opinion that Hays was guilty of a crime in this case. Because we are reversing the judgment on other grounds, we need not decide whether the admission of this evidence was prejudicial.

## DISPOSITION

The judgment is reversed.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, Acting P. J.                    JOHNSON, J.

21